John E. KIRCHNER, Appellant,

v.

The KANSAS TURNPIKE AUTHORITY, Appellee.

No. 7548.

United States Court of Appeals Tenth Circuit.

Sept. 11, 1964.

Emmet A. Blaes and Harry L. Hobson, Wichita, Kan., for appellant.

Malcolm Miller, Wichita, Kan. (George B. Powers, Charles J. Woodin and William Timmerman, Wichita, Kan., with him on the briefs), for appellee.

Before PHILLIPS and LEWIS, Circuit Judges, and CHRISTENSEN, District Judge.

CHRISTENSEN, District Judge.

Federal jurisdiction being based on diversity of citizenship, this suit for damages for breach of contract primarily involves a problem of state law. On November 10, 1960, the Kansas Turnpike Authority entered into a contract of employment with the appellant Kirchner as general manager of the Authority at a salary of $16,500 a year for a period of three years, beginning February 10, 1961, and expiring February 10, 1964. On June 26, 1961, the Turnpike Authority terminated the employment of Kirchner under the contract. Kirchner

brought this action against the Authority to recover compensatory and punitive damages for breach of contract. From a judgment in favor of the Authority, Kirchner has appealed.

The facts affecting liability are not in dispute. Two questions of law are presented:

1. Was the appointment of Kirchner as general manager under the contract an appointment to an office the tenure of which had not been declared by law, within the meaning of Article 15, § 2 of the Kansas Constitution, so that such tenure was only during the pleasure of the Authority making the appointment; and

2. Was the contract invalid because the term of employment extended beyond the possible term of service of a majority of the members of the Turnpike Authority at the time it was made, or did it become invalid because their terms were terminated by statute prior to the expiration of the term of the contract?

The trial court decided both of those questions in favor of the Authority.

The Turnpike Authority was created by an Act of the Kansas Legislature which became effective April 7, 1953. Laws of Kansas, 1953, ch. 308, pp. 570–581.[1] Section 3 of the Act [as amended in 1959 (G.S.Kan., 1959 Supp. § 68–2003)], in part provided:

"SEC. 3. *Kansas turnpike authority.* There is hereby created a body politic and corporate to be known as the 'Kansas turnpike authority.' The authority is hereby constituted a public instrumentality and the exercise by the authority of the powers conferred by this act in the construction, operation and maintenance of turnpike projects shall be deemed and held to be the performance of an essential governmental function."

It was further provided that the Authority should consist of seven members: Four appointed by the Governor to serve for terms expiring July 1, 1954, July 1, 1955, July 1, 1956, and July 1, 1957, respectively; a fifth member, the State Director of Highways; a sixth member, the Chairman of the Committee on Highways of the Senate; and the seventh member, the Chairman of the Roads and Highways Committee of the House; and that the successor of each appointed member should be appointed for a term of four years. Thus it will be seen that at the time of the making of the contract, November 10, 1960, and at the time of the effective date thereof, February 10, 1961, the terms of three of the appointed members would expire before the end of the term of the contract and the term of one, a member appointed July 1, 1960, would extend beyond the term of the contract, while the terms of the ex officio members might or might not extend beyond the term of the contract.

Section 4 of the Act provided that the Authority was authorized and empowered to adopt bylaws for the regulation of its affairs and the conduct of its business; to determine the location of each turnpike project financed under the Act and its design and materials of construction and "construct, maintain, repair and operate the same;" to issue bonds to provide such funds for any of its corporate purposes, payable from tolls and revenues pledged for their payment; to establish rules and regulations for the use of any turnpike; to make and enter into "all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this act;" and "employ consulting engineers, attorneys, accountants, construction and financial experts, superintendents, managers, and such other employees and agents as may be necessary in its judgment, and to fix their compensation;" and "do all acts and things necessary or convenient to carry out the powers expressly granted in this act."

Section 3 of the Act provided:
"The authority shall elect one of the members as chairman of the au-

thority and another as vice-chairman, and shall also elect a secretary-treasurer who need not be a member of the authority. The chairman, vice-chairman and secretary-treasurer shall serve as such officers at the pleasure of the authority."

Article III, paragraph 1, of the bylaws adopted by the Authority and in effect at the time the contract here involved was entered into provided under the heading "Officers":

"1. The officers of the Authority shall be a Chairman, a Vice-Chairman and a Secretary-Treasurer, the last named need not be the same person. The Chairman, Vice-Chairman and Secretary-Treasurer shall hold such offices until the election of their successors."

There was a further provision that in addition to the officers above mentioned, the Authority "may provide for such deputies, assistants and other officers as it may deem necessary from time to time. * * *" Under the separate heading "Employment", it was stated by the bylaws, in the words of the statute, that the Authority "may provide for the employment of such consulting engineers, attorneys, accountants, construction and financial experts, superintendents, managers, and such other employees and agents as may be necessary in its judg-

ment. * * *" An agreement employing a general manager for a term of three years, in form similar to the one with which we are concerned, had been entered into by the Authority on October 14, 1957. After the expiration of the reserved basic three year term, it was terminated by the Authority by 90 days notice in accordance with the agreement of the parties. It was upon the termination of the former agreement that appellant was employed.

Paragraph 5(n) of the stipulation of facts reads:

"(n) The General Manager exercised the authority generally expected of an executive manager in carrying out the responsibilities of the Authority, subject to its constant supervision, approval and direction." [2]

The terms of the trust agreements between the defendant and the Guaranty Trust Company of New York, The Fourth National Bank and Trust Company, Wichita, and the Riverview State Bank, are referred to in plaintiff's contract with defendant. Section 1301 of Article XIII of the trust agreement of October 1, 1954, provides:

"In the event of the dissolution of the Authority all of the covenants, stipulations, obligations and agreements contained in this Agreement

---

2. Section 5 of the agreement here involved defined the duties and authority of the General Manager, as follows:

"5. As such General Manager, said J. E. Kirchner shall be responsible, within the terms of the By-Laws of the Authority, Chapter 308, Laws of Kansas, 1953, and Chapter 368, Laws of Kansas, 1957 and the Trust Agreements above referred to, to do and perform all acts and things ordinarily required and expected of a General Manager and shall be and he is hereby authorized on behalf of the Authority to execute approved construction contracts, approve estimates, obtain the payment of estimates and accounts, employ and release personnel of the Authority and set their salaries, subject to the approval of the Authority, and he is further authorized to perform and carry out all other matters required and to be expected with

relation to the construction and operation of the Kansas Turnpike Projects and in conformity with the said Trust Agreements and the Engineering Reports adopted or to be adopted by the Authority concerning the said Kansas Turnpike Projects; Provided, in all matters of purchases of items, equipment and services, except services by employees, in excess of $2,000.00, shall first be presented to the Authority for approval; and, Provided, Further, that all matters, except those deemed to be routine in nature, shall be fully reported to the Authority in writing by the General Manager at the meeting of the Authority next following such transaction.

"It is agreed, that the General Manager shall have the right to approve or disapprove all supervisory personnel or department heads of the Authority, subject to the approval of the Authority."

by or in behalf of or for the benefit of the Authority shall bind or inure to the benefit of the successor or successors of the Authority from time to time and any officer, board, commission, authority, agency or instrumentality to whom or to which any power or duty affecting such covenants, stipulations, obligations and agreements shall be transferred by or in accordance with law, and the word 'Authority' as used in this Agreement shall include such successor or successors."

By the Act of May 1, 1961, Laws of Kansas, 1961, ch. 307, § 1, (G.S.Kansas 1961 Supp. 68–2003), the Kansas legislature amended the Turnpike Act so as to reduce the number of appointed members from four to two, with the same ex officio members to serve. It provided that the two new members should be appointed on May 1, 1961, one for a term of three years and one for a term of four years, and that upon the appointment of the two new members of the Authority under the provisions of the amendment the terms of the existing appointed members should be terminated and that they should surrender their offices and all property and funds under their control.

On June 26, 1961, the Authority undertook to combine the offices of general manager and chief engineer and to create a new position of chief engineer-manager, to appoint the then chief engineer to the new position and to terminate appellant's employment as general manager. As a matter of fact, only one of the persons who were ex officio members of the Authority at the time the contract was entered into with appellant was a member of the Authority on June 26, 1961. Two who were ex officio members of the Authority on November 10, 1960, ceased to be members within the three-year term of the Kirchner contract.

Article 15, Section 2 of the Kansas Constitution provides:

"Tenure of office; merit system in civil service. The tenure of any office not herein provided for may be declared by law; when not so declared, such office shall be held during the pleasure of the authority making appointment; but the legislature shall not create any office the tenure of which shall be longer than four years, except that appointments under a merit system in civil service shall not be subject to such limitation. * * * *"

◼ We are of the opinion that appellant, as general manager of the Authority, was not an officer or the holder of an office within the contemplation of the Kansas Constitution. Section 4 of the Turnpike Authority Act, supra, classified "superintendents" and "managers" as employees, and the form and substance of the bylaws of the Authority, in keeping, as they are, with the statute, support this conclusion. It is true, as pointed out by respondent, that in the preamble to the form of contract employing the general managers it was recited as desirable that the Authority have such an "officer" to manage and operate the Kansas Turnpike Authority as provided in said Trust Agreement, but this did not change the essential character of the employment; and it is apparent that this reference was not intended to have any constitutional significance, nor did it. The tenure of the general manager of the Turnpike Authority was not provided by law, but neither was his employment an "office" of the type contemplated by the constitutional limitation.

In Sowers v. Wells, 150 Kan. 630, 95 P.2d 281 (1939), the court indicated that an indispensable attribute of a public office was the right to exercise some portion of the sovereign power. The respondent relies upon Miller v. Board of Com'rs of Ottawa County, 146 Kan. 481, 71 P.2d 875 (1937); Hall v. City of Wichita, 115 Kan. 656, 223 P. 1109 (1924), and Haney v. Cofran, 94 Kan. 332, 146 P. 1027 (1915), to demonstrate that the appellant as manager was an officer. These cases, and others cited to similar effect, do not sustain the Authority's position. The first case in-

volved a county engineer held to be a public officer since, among other things, his detailed duties had been specified by the legislature and were not matters for supervision or determination by the appointing board. The other cases involved police officers. In Haney v. Cofran, the basis of these rulings is expressed as follows:

"A policeman is a conservator of the peace and exercises many of the functions of sovereignty, and important duties are imposed upon him by the Legislature. * * *"

The situation of the appellant as manager was quite different. He exercised no sovereign powers; his duties, prerogatives or functions were not established by legislative grant and he exercised authority only by permission, and under the continuing supervision, of the Authority.

The question whether the Authority could enter into a contract with Kirchner to serve as general manager for a term of three years from February 10, 1961, which term might and did extend beyond the time when a majority of the members of the Authority continued to hold their offices, presents a more difficult question.

The Authority itself was and is a public instrumentality of a continuing nature, notwithstanding the fact that the membership of the Authority may change from time to time. As was said in a somewhat different context, but yet with broad reasonableness and practicality, in Federal Savings & L. Ins. Corp. v. Strangers' Rest Bap. Ch., 156 Kan. 205, 131 P.2d 654, 659 (1942), "(W)hether such changes occur in the membership of a church society, or of a board of county commissioners, or of a city counsel, as they are bound to do in the lapse of years, the church society, the county board, and the city council, continues to exist, and to be bound by the lawful obligations incurred by their predecessors in office." The main question whether appellant's contract represented a lawful obligation of the Authority remains.

It has been stated as a general rule, supported perhaps by the weight of authority, that where a governmental board or authority contracts for services, and the services to be rendered under the contract are duties delegated to the supervision of such board or authority, a contract for a period beyond the term of the board is invalid. See Annot. 70 A.L.R. 794, 799, et seq. and Annot. 149 A.L.R. 336, 342, et seq. However, there is a respectable minority rule to the contrary, as is indicated by the last cited annotations. While the application of either rule is sometimes rendered uncertain by differences of opinion as to what constitutes the "term" of a board of staggered membership, the Supreme Court of Kansas apparently has not been diverted by technical distinctions but has committed itself to a practical approach not inconsistent with the minority rule.

In State ex rel. Smith v. Board of Com'rs of Wyandotte County, 131 Kan. 747, 293 P. 525, 526 (1930), in invalidating an extended contract for contributions as rent of an armory, the Kansas court quoted with approval from 15 C.J. 542:

"The general rule is that contracts extending beyond the term of the existing board and the employment of agents or servants of the county for such a period, thus tying the hands of the succeeding board and depriving the latter of their proper powers, are void as contrary to public policy." [See, also, 20 C.J.S. Counties § 176].

However, this case turned upon circumstances and statutory provisions quite peculiar to it. More recently Kansas has recognized that where the governmental instrumentality has a continuing existence, notwithstanding the membership thereof changes from time to time, and where continuing contractual relationships are reasonable, they may be sustained. Thus in Fisk v. Board of Managers of Kan. State Soldiers' Home, 134 Kan. 394, 5 P.2d 799 (1931), in concluding that an administrative board, empowered to manage a soldiers' home,

could contract beyond the term of its members, the court said:

"Where general power is given to an administrative board to manage and control property, it has the power to make a contract concerning such property extending beyond the term of the members thereof, if such contract is reasonable and not contrary to public policy. This rule of law is recognized in all transactions with the board of managers involving a contract extending beyond the term of the members of the board, and its validity must of necessity depend upon the nature of the contract and the end to be accomplished. If the contract is reasonable, prudent, and economically sound, it is not contrary to public policy. * * * *"

In Verdigris River D. Dist. No. 1 v. State Highway Com'n, 155 Kan. 323, 125 P.2d 387, 391 (1942), the court enforced the obligation of the State Highway Department as successor to the Board of County Commissioners to forever maintain a flood gate during the existence of a certain levee. The contract was held a reasonable one to preserve the drainage of a highway, within the rule stated in 7 R.C.L. at page 945 § 21, which was quoted with approval.[3]

Based partly upon business advisability, a long term contract by city officials in relation to a sewer system was held valid in City of North Newton v. Regier, 152 Kan. 434, 103 P.2d 873 (1940). In Board of County Com'rs of Edwards County v. Simmons, 159 Kan. 41, 151 P.2d 960 (1944), the sustained contract was with an attorney and concerned delinquent tax accounts.

It has been indicated by the Kansas court in another connection that the maintenance of hospitals and poor farms (perhaps analogous to soldiers' homes), the maintenance of sewer systems and highways, and matters of taxation, generally constitute governmental functions. Stolp v. Arkansas City, 180 Kan. 197, 303 P.2d 123 (1956). The distinction between these and proprietary functions deemed important in relation to sovereign immunity, in Kansas apparently has not been considered of moment in relation to the problem at hand.

There is no suggestion that in 1960 the Turnpike Authority had any ulterior motives in appointing appellant for a three year term. His predecessor had been employed and served the entire three years under a similar contract. The Attorney General of Kansas by formal opinion had confirmed the power of the Authority to so proceed. It seems obvious that a general manager for the Turnpike Authority, competent to discharge the functions and duties required of him under the contract, probably could not be obtained at a reasonable compensation if the period of his services was at the will of the members of the Authority.

---

3. " * * * The general rule is laid down in 7 R.C.L. at page 945, § 21, and is as follows:
" 'But it is clear that if a board of county commissioners has express power to make a particular contract at any time during its term of office, a contract made by such board, in accordance with the law, a short time before the expiration of its term of office is not contrary to public policy, and, in the absence of fraud, is valid and binding upon an incoming board of commissioners, although it extends far into their term of office. The ground upon which this rule is based is that a board of county commissioners is a continuously existing corporation, and, consequently, while the personnel of its membership changes, the corporation continues unchanged. Its contracts being the contracts of the board and not of its members, it follows that those contracts extending beyond the term of service of its then members are not invalid for that reason. It has been said that to hold contracts invalid because part or all of a board cease to exercise public functions would be to put these corporations at an enormous disadvantage in making the contracts which are essential to the safe, prudent, and economical management of the affairs of a county. The members of a board of county commissioners cannot, however, contract in reference to matters which are personal to their successors.' "

The contract entered into with Kirchner was not unreasonable nor imprudent, and was designed to attract the services at reasonable compensation of a competent man to the advantage of the state. See State v. City of Garnett, 180 Kan. 405, 304 P.2d 555 (1956); Board of County Com'rs of Edwards County v. Simmons, 159 Kan. 41, 151 P.2d 960 (1944), supra; City of North Newton v. Regier, 152 Kan. 434, 103 P.2d 873 (1940), supra; Fisk v. Board of Managers of Kan. State Soldiers' Home, 134 Kan. 394, 5 P.2d 799, supra.

Appellee argues "as a matter of mathematical fact" that the majority of the members of the Authority could change each year. Of course, considering death, resignation or other contingencies they could change oftener. Perhaps this is the reason counsel for appellee suggested during the oral argument that the Authority had no power to enter into contracts for fixed duration, however short. Such a limitation seems wholly impractical and in our opinion not required by Kansas law.

The appellant seeks to distinguish some of the cases mentioned above from the case at bar with the explanation that we here are dealing with governmental rather than proprietary functions. But even the majority rule would recognize the validity of the contract in question if it involved merely a proprietary function, and the Kansas line of cases upon which we rely broadly treats contracts implementing governmental functions. And in other cases the court bases its rulings on considerations other than any such distinction.

Main reliance is placed by the Authority upon McNeal v. State Highway Commission, 143 Kan. 651, 56 P.2d 74 (1936). That case involved a written contract engaging an office employee for a term of one year, made by the State Highway Director. That appointment was made under a statute authorizing the Director, subject to the approval of the State Highway Commission, to employ, remove, define the duties and fix the salaries of engineers, clerks, stenographers, and such other employees as might be necessary to carry out the work of the Commission. The court held that the Director could not enter into a contract the effect of which was to deprive him of his power (expressly granted by the legislature) to remove an employee, and that it was an attempt by the Director to contract against his statutory powers, duties, and obligations and those of any successor to his office. While there are similarities in broad outline, in principle and reasoning the case is not in point.

Counsel for the Authority also cite the case of Vieira v. Jamestown Bridge Commission, 91 R.I. 350, 163 A.2d 18 (1960), as involving a factual situation close to that presented here. There a general manager was employed by a bridge authority for a term of ten years, running beyond the staggered terms of the commissioners. The manager was a member of the authority at the time he was employed but refrained from voting. While the court did not base its decision on the asserted conflict of interest, this, and the longer term, indicate some practical distinctions. Without discounting the comparability of facts, it seems sufficient to note that the Rhode Island decision represents a rigid line of authority which the Kansas Court apparently chooses not to follow.

We do not think that the legislative action of 1961 affected the validity of the otherwise proper contract of employment. The 1961 amendment to the act creating the Turnpike Authority, effective May 1, 1961, terminated the terms of the appointive members of the Authority and reduced the total membership from seven to five. Undoubtedly the legislature had power to so do. But in our judgment this had no greater effect than if the terms to which they had been initially appointed had expired. The argument that the 1961 Act not only reconstituted the Authority but replaced or abolished it is not convincing. The Act was merely an amendment to the basic statute. It expressly provided that, "Upon the appointment of the new members of the Kansas Turnpike Authority

under the provision of this amendment the terms of the present appointive members of the Authority shall immediately be terminated and the present members of said authority shall surrender their offices and all the property and funds under their control by virtue of their offices to the new members of the authority". The trial court pointed out that "The Turnpike Act at its inception contemplated the possibility that the Authority could be 'abolished' (G.S. 68–2001)." This, it reasoned, in effect is what the legislature did "when it amended G.S. 68–2003, repealed the original 1953 section and established a new or different authority." But it is contemplated that many agencies of a state may be abolished, whether this is expressed in the statute creating them or not. This does not necessarily render them incapable of contracting beyond the terms of their members. Moreover, the former Turnpike Authority was not abolished. It was in reality only reconstituted. The original language creating the Authority and establishing its powers and functions was re-enacted by the 1961 amendment and many related sections of the original Act were left intact. As to future transactions, the provisions introduced by the amendatory Act should be read together with the provisions of the original section that were re-enacted in the amendatory act or left unchanged thereby, as if they had been originally enacted as one statute. Provisions of the original Act which are repeated in the body of the amendment, either in the same or equivalent words, are considered a continuation of the original law. I Sutherland Statutory Construction 3rd Ed., ¶¶ 1934, 1935, pp. 430–434; Blair v. Chicago, 201 U.S. 400, 26 S.Ct. 427, 50 L.Ed. 801 (1906); cf. Tyson v. United States, 10th Cir., 285 F.2d 19 (1960). This rule of interpretation is applicable even though the original Act or section is expressly declared to be repealed. I Sutherland Statutory Construction 3rd Ed. ¶ 1933, pp. 425–426. Ex parte Allen, 91 Ohio St. 315, 110 N.E. 535 (1915); cf. Berry v.

Kansas City, Ft. S. & M. R. Co., 52 Kan. 759, 34 P. 805 (1893).

■ As indicated, we do not believe that this amendment was intended to abrogate what was theretofore a valid and continuing contract of employment. But if it were, it would appear invalid for that purpose as an impairment of the obligation of contract. Hall v. Wisconsin, 103 U.S. 5, 26 L.Ed. 302 (1880); cf. State ex rel. Boynton v. Kansas State Highway Commission, 139 Kan. 391, 32 P.2d 493 (1934). Such an intent will not be presumed.

■ The final contention of the Authority, that appellant's contract is unenforceable because it lacked mutuality, is patently untenable and requires no discussion.

The judgment of the trial court is reversed on the issue of liability, and the case is remanded for further proceedings in harmony with this opinion.