**CONOCO INC. and Consolidation Coal Company, Plaintiffs,**

**v.**

**Donald P. HODEL, Secretary of the Interior and United States Department of the Interior, Defendants.**

**Civ. A. No. 85–277 MMS.**

United States District Court, D. Delaware.

Jan. 14, 1986.

Andrew B. Kirkpatrick, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del.; of counsel: Richard McMillan, Jr., Steven P. Quarles, and Peter K. Levine of Crowell & Moring, Washington, D.C., for plaintiffs.

William C. Carpenter, Jr., U.S. Atty., and Richard G. Andrews, Asst. U.S. Atty., Wilmington, Del.; Alan Brenner, Dept. of Justice, Washington, D.C., for defendants.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiffs Conoco, Inc. ("Conoco") and Consolidated Coal Company ("Consolidated") seek declaratory relief to prevent defendant the Secretary of the Interior ("the Secretary") from applying Section 2 of the Mineral Lands Leasing Act ("MLLA"), codified as amended at 30 U.S.C. § 201(a)(2)(A) (1982), to federal leases of minerals other than coal.

The matter is before this Court on cross-motions for summary judgment. For the reasons explained below, the Court will deny plaintiffs' motion and will grant defendant's motion for summary judgment.

### Facts

Under the authority of the Mineral Lands Leasing Act of 1920 ("MLLA"), 30 U.S.C. § 181 *et seq.* (1982), the Secretary of the Interior leases federal lands containing certain types of mineral deposits. Subchapter I of the MLLA contains generally applicable mineral leasing provisions; subchapters II, III, IV, V, VII, VIII, and IX cover the leasing of coal, phosphates, oil and gas, oil shale, sodium, sulphur, and potash, respectively.

In 1976 Congress enacted the Federal Coal Leasing Amendments Act ("the FCLAA"). Section 3 of the FCLAA amended subchapter II of the MLLA and established additional requirements for the issuance of new federal coal leases.[1] One of the purposes of the FCLAA was to promote the "diligent development" of federal coal leases. *See* 30 U.S.C. §§ 202a(2), (3); H.R.Rep. No. 681, 94th Cong., 2d Sess. 9–13 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News pp. 1943, 1945–48. To achieve that goal, Section 2 of the MLLA as amended penalizes companies that have held a federal coal lease for more than ten years from the effective date of the statute, August 4, 1976, without producing coal therefrom in commercial quantities.[2]

Under the Secretary's interpretation of Section 2, any holder of federal coal leases acquired prior to August 4, 1976 who fails adequately to develop those leases by August 4, 1986[3] is precluded from acquiring new federal leases for coal and for every other mineral covered by the MLLA. Companies "controlled by or under common control with" such a holder ("associated companies") are similarly precluded. *See* 30 U.S.C. § 201(a)(2)(A). Under the final guidelines issued by the Secretary, "a subsidiary's violation [of Section 2] is charged to a controlling parent...." 50 Fed.Reg. 35144 (Aug. 29, 1985).

Conoco is an energy company incorporated in Delaware with its principal place of business in Houston, Texas. Conoco engages in the exploration, production, refining, and marketing of oil and gas products, and derives substantial revenue from its holdings of federal onshore oil and gas leases. Consolidated, a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania, is a wholly owned subsidiary of Conoco and a major coal producer and marketer.

---

1. Section 2 is the amended portion of the MLLA under discussion. Hereinafter, a reference to "Section 2" is to Section 2 of the MLLA, codified at 30 U.S.C. § 201(a)(2). A reference to "Section 3" is to Section 3 of the FCLAA which amended Section 2 of the MLLA.

2. Section 2(a)(2)(A) of the MLLA as amended shall not take effect until December 31, 1986. Pub.L. No. 99–190, § 320 (Dec. 19, 1985).

3. *See supra* note 2.

Consolidated holds thirty undeveloped federal coal leases issued prior to 1976 which contain an estimated 1.3 billion tons of recoverable coal. To avoid the penalty of Section 2(a)(2)(A), Consolidated must have these properties in production by August 4, 1986. Consolidated asserts it cannot produce coal from these leaseholds in commercial quantities by that date. For purposes of this litigation, Consolidated does not dispute that it will not be permitted to require additional federal coal leases after August 4, 1986.[4] Complaint at ¶ 22.

At present, twenty percent of Conoco's total oil and gas leases, encompassing some one and one-half million acres, are held in federal onshore leases. In addition, Conoco adds over 10,000 leases to its inventory per year. Between 1981 and 1985, Conoco annually acquired federal onshore oil and gas leases ranging from 48,000 to 365,000 acres. If Consolidated continues to hold its nonproducing pre-1976 federal coal leases after December 4, 1986,[5] Conoco, as the parent of Consolidated, will be required to forgo the opportunity to obtain new federal oil and gas leases. Conversely, if Consolidated divests itself of the pre-1976 leases in order to allow Conoco to continue to acquire new federal oil and gas leases, it alleges the divestiture, even if feasible, "would result in substantial financial losses." *Id.* ¶ 23.

Plaintiffs assert the Secretary has wrongfully interpreted the federal lease-exclusion provisions of Section 2(a)(2)(A) of the MLLA by extending it to companies such as Conoco which are affiliated with companies holding federal coal leases, but which themselves own no coal leases and seek only non-coal federal mineral leases. Further, plaintiffs charge that in February, 1985, the Secretary suddenly changed his longstanding interpretation that the Sec-

tion 2(a)(2)(A) prohibition applied only to coal leases.

Plaintiffs seek a declaration from this Court that the Secretary's interpretation is arbitrary and capricious, an abuse of discretion, beyond the Secretary's authority and contrary to law, and that the prohibition of Section 2(a)(2)(A) of the MLLA applies to federal coal leases only. Conoco also seeks a declaratory judgment that the Secretary shall allow it to apply for federal non-coal leases without regard to the status of Consolidated's pre-1976 federal coal leases.[6]

The Secretary denies his statutory interpretation of Section 2(a)(2)(A) to include federal non-coal leases is either new or erroneous. The Secretary claims the plain language of the statute and the legislative history negate the plaintiff's interpretation and that the Department's interpretation has been consistent since the statute was enacted.

*Analysis*

1. *Statutory Language*

■ In all cases involving statutory construction, a court's starting point must be the language employed by Congress. *See, e.g., North Dakota v. United States*, 460 U.S. 300, 311, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). The ordinary presumption is that the words of the statute are conclusive evidence of the legislative purpose. *See, e.g., Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

Section 3 of the Federal Coal Leasing Amendment Act of 1975 amended the last sentence of Section 2(a) of the Mineral Lands Leasing Act (30 U.S.C. § 201(a)) to read:

---

**4.** *See supra* note 2 for the effective date of the statute.

**5.** *See supra* note 2 for the effective date of the statute.

**6.** Plaintiffs in their complaint claim that the Secretary failed to act in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 551 *et seq.,* in promulgating its interpretation of Section 3 of the FCLAA. Complaint at ¶ 18. Plaintiffs have not pursued this claim in their motion for summary judgment, in which they assert that "[t]his case raises the single issue of whether [Section 3 of the FCLAA] ... was intended not only to regulate federal coal leasing but substantially to impact federal leasing of oil, gas and other minerals as well." Dkt. 4 at 1–2.

*The Secretary shall not issue a lease or leases under the terms of this Act*[7] *to any person, association, corporation, or any subsidiary, affiliate, or persons controlled by or under common control with such person, association, or corporation, where any such entity holds a lease or leases issued by the United States to coal deposits and has held such lease or leases issued for a period of ten years when such entity is not, except as provided for in section 7(b) of this Act,*[8] *producing coal from the lease deposits in commercial quantities. In computing the ten-year period referred to in the preceding sentence, periods of time prior to the date of enactment shall not be counted.*

Pub.L. No. 94–377, § 3 (1976), *codified at* 30 U.S.C. § 201(a)(2)(A) (1982) (emphasis added).

Plaintiffs urge the opening portion of the first sentence of Section 2, reading "The Secretary shall not issue a lease or leases under the terms of this Act...." means "The Secretary shall not issue a coal lease or leases under the terms of this Act...." Plaintiffs buttress their position by noting that the word "lease" as used in the remainder of the sentence refers to "coal lease," and therefore when "lease" is first used in the sentence it must also refer to coal lease. Plaintiffs go on to point out that the words "lease," "leases," "leasing," and "lessee" are used over one hundred times in the rest of the FCLAA. Only

fifty-five times are these words accompanied by the word "coal" in the same sentence, and twenty-eight times the word "coal" does not even appear in the same paragraph. Plaintiffs argue that this consistent usage establishes a "common usage" of the word "lease" to mean "coal lease" throughout the FCLAA.[9]

It is true that the words "lease," "leases," "leasing," and "lessee" as used in the FCLAA generally refer to coal leases. This does not mean the first use of the word "lease" in Section 3 also means "coal lease."

Plaintiffs focus unduly on the word "a lease or leases" in the first sentence. A word in a statute cannot be construed in isolation. The sentence reads: "... a lease or leases under the terms of this Act...." Plaintiffs would have the Court ignore the phrase "under the terms of this Act," arguing that it is "immaterial" whether "this Act" refers to the FCLAA or the MLLA.

■ A statute cannot be read so as to render certain words nugatory. *See, e.g., United States v. Johnson,* 462 F.2d 423, 428 (3d Cir.1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1983). Plainly the words "under the terms of this Act" modify the word "a lease or leases." The question then becomes, to which Act, the FCLAA or the MLLA, do the words "this Act" refer?

---

**7.** As codified at 30 U.S.C. § 201(a)(2)(A), this sentence reads: "The Secretary shall not issue a lease or leases under the terms of this chapter...."—not "Act." "Chapter," of course, refers to Chapter 3A of title 30; that is, to the MLLA, not the FCLAA. Because the Statutes at Large prevail over the Code whenever the two are inconsistent, *American Bank & Trust Co. v. Dallas Cty.,* 463 U.S. 855, 103 S.Ct. 3369, 3375 n. 8, 77 L.Ed.2d 1072 (1983) (citing *Stephan v. United States,* 319 U.S. 423, 426, 63 S.Ct. 1135, 1136, 87 L.Ed. 1490 (1943) ), and the particular Code section has not been enacted into positive law, the Court confines its interpretation to the statute as enacted, and not as subsequently codified.

**8.** Codified at 30 U.S.C. § 207(b). This Section waives the requirement of continued operation where the operations "are interrupted by strikes, the elements, or casualties not attributa-

ble to the lessee." Plaintiffs make no claim that this exception applies to them.

**9.** In support of their common-usage argument, plaintiffs rely on *Mills Music, Inc. v. Snyder,* —— U.S. ——, ——, 105 S.Ct. 638, 646, 83 L.Ed.2d 556 (1985), in which the Supreme Court construed a subsection of the copyright law, 17 U.S.C. § 304(c)(6)(A), which uses the word "grant" three times within a single sentence. The Court stated: "[i]t is logical to assume that the same word has the same meaning when it is twice used earlier in the same sentence." One cannot wrench a sentence out of the Supreme Court's opinion in *Mills Music* and apply it to the statute under review. To do so is to substitute wooden formalism for analysis. In the context of *Mills Music,* the Supreme Court's interpretation was, to use its characterization, "logical." No logic compels this interpretation in an entirely different statute.

If "this Act" refers to the FCLAA, then Congress was referring only to federal coal leases, for the FCLAA deals with coal leases. If "this Act" refers to the MLLA, however, then Congress was referring to *all* federal mineral leases since the MLLA grants the Secretary authority to lease deposits of coal, phosphate, sodium, potassium, oil, gas, oil shale; and gilsonite on federal lands.

Read in context "this Act" refers to the MLLA and not the FCLAA. First, Congress was amending the MLLA by enacting the FCLAA. Section 3 of the FCLAA begins: "The last sentence of section 2(a) of the Mineral Land Leasing Act (30 U.S.C. § 201(a)) is amended to read as follows: '(2)(a) The Secretary shall not issue a lease or leases under the terms of this Act....'" Pub.L. No. 94–377, § 3 (1976). The amended subsection beginning "The Secretary shall not issue...." is thus expressly intended to replace the old section 2(a) of the MLLA. According to well-established principles of statutory construction, this new section is to be considered as part of the original act. *Markham v. Cabell*, 326 U.S. 404, 411, 66 S.Ct. 193, 196, 90 L.Ed. 165 (1945); *Republic Steel Corp. v. Costle*, 581 F.2d 1228, 1232 (6th Cir.1978) (citing *Markham*), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979); *Kirchner v. Kansas Turnpike Auth.*, 336 F.2d 222, 230 (10th Cir.1964); *see also* 1A Sutherland Stat. Const. § 22.34, at 293 (4th ed. rev. 1985). Since the new section is considered part of the old act, the reference to "this Act" necessarily refers to the MLLA, not the FCLAA.

Second, the words "under the terms of this Act" become mere surplusage if read to refer to the FCLAA. The entire subject matter of the FCLAA is federal coal leasing. If Congress had intended to mean "coal lease" when it used the words "a

lease or leases under the terms of this Act" it could have accomplished that aim by saying simply: "The Secretary shall not issue a lease or leases to any person...."

Third, the very next sentence of Section 3 of the FCLAA refers to "the Federal Coal Leasing Amendments Act of 1975." [10] If by "this Act" in the first sentence of Section 3 Congress had intended to refer to the FCLAA, it is unclear why it would have then spelled out its reference to the FCLAA in the succeeding sentence.[11] The Court is constrained to assume that Congress by choosing different words intended to convey different meanings.

Moreover, the words "lease" or "leases" when used in the remainder of that first sentence unambiguously refer to coal leases: "where such entity holds a lease or lease issued by the United States to coal deposits and has held such lease or leases...."; and "when such entity is not ... producing coal from the lease deposits...." Congress used very different words modifying the words "lease" or "leases" in these latter clauses than it did in the first clause of the sentence. If Congress had meant its first use of "lease or leases" in this sentence to refer to "coal leases," it would have had no occasion to make explicit later in the sentence that "lease or leases" referred to coal leases only. Once again, plaintiffs' argument would render superfluous part of the statutory language used by Congress.

Plaintiffs point also to other sections of the statute as supportive of their position. First, plaintiffs argue that Section 7(b) of the MLLA, as amended by Section 6 of the FCLAA, does not use the word "coal" once, although it uses the words "lease" and "lessee" eight times. Plaintiffs conclude that "lease," used without modification, means "coal lease." Plaintiffs neglect to

---

**10.** Section 8 of the Act of October 30, 1978, 92 Stat. 2075, changed the title to the Federal Coal Leasing Amendments Act of 1976.

**11.** The second sentence of Section 3 of the FCLAA reads: "In computing the ten-year period referred to in the preceding sentence, periods of time prior to the date of enactment of the

Federal Coal Leasing Amendment Act of 1975 shall not be counted." As codified, this Section reads: "In computing the ten-year period referred to in the preceding sentence, periods of time prior to August 4, 1976 [the date of enactment of the FCLAA], shall not be counted."

point out, however, that Section 6 of the FCLAA also amends Section 7(a) of the MLLA; and Section 7(a) begins by discussing "coal leases." In the context of Section 7, then, the words "lease" or "leases" in Section 7(b) clearly refer to "coal leases."

Second, plaintiffs point to Sections 3, 5(b), and 6 of the FCLAA, which amend MLLA Sections 2(a)(3)(D), 2(d)(3), and 7(c), respectively, codified at 30 U.S.C. §§ 201(a)(3)(D), 202a(3), & 207(c) (1982). Each of these sections uses the term "lease" unmodified to refer to coal leases. As is readily apparent, however, these entire paragraphs are subsections contained within larger sections, the context of which in every instance makes clear that "lease" refers to coal lease. *See* 30 U.S.C. § 201(a)(3)(A)(i) ("No lease sale shall be held unless the lands containing the coal deposits...."); *id.* § 202a(1) ("The Secretary, upon determining that maximum economic recovery of the coal or coal deposits is served thereby, may approve the consolidation of coal leases into a logical mining unit...."); and *id.* § 207(a) ("A coal lease shall be for the term of twenty years....").

Third, plaintiffs argue that the language used in Section 9 of the FCLAA buttresses its argument that "lease" means coal lease. Section 9 amends the MLLA by providing that a certain percentage of federal royalties is to be given to the States to use "as the legislature of the State may direct giving priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this Act." Pub.L. No. 94–377, § 9(a) (1976), codified at 30 U.S.C. § 191 (1982). Plaintiffs argue that this specific reference to *all* "minerals leased" leads to the conclusion that the word "lease" in all other places in the FCLAA means "coal lease." The answer to this argument is that Congress in Section 9 was addressing a concern entirely different from that addressed by Section 2. The focus of Section 2 is to encourage development of federal coal leases held by the private sector. Section 9 on the other hand directs funds to areas affected by development occurring because of MLLA leases. Whatever support plaintiffs are able to derive from Section 9 is outweighed by the lack of support the text of Section 2(a)(2)(A) itself gives their interpretation.

Plaintiffs also argue that the Secretary's interpretation of Section 3 of the FCLAA is "illogical" because it imposes on undeveloped pre-1976 federal coal leases a sanction far more severe than the sanction on undeveloped post-1976 federal coal leases.[12] The proper forum for this type of argument is Congress, not the courts. The courts have no power to undo purely on policy grounds what Congress has done. "[T]hat Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes." *United States v. Locke,* —— U.S. ——, ——, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985). Nor may the judiciary "soften the clear import of Congress' chosen words whenever a court believes those words lead to a harsh result." *Id.*

### 2. *Legislative History*

Plaintiffs also assert there is support for their position in the legislative history of the FCLAA. It may be appropriate for a court to examine committee reports and other authoritative legislative material in order to determine congressional intent as embodied in positive law. Determining the meaning of a statute from its legislative history is a step to be taken cautiously, particularly where, as here, the meaning appears clear from the face of the statute. *Rivera v. Becerra,* 714 F.2d 887 (9th Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 124 (1984).

Plaintiffs consider it significant that no member of Congress in discussing the FCLAA ever mentioned that the Section 3 prohibition would affect either the issuance

---

**12.** Section 6(a) of the FCLAA provides that any coal lease which is not producing in commercial quantities at the end of ten years shall be terminated. Other mineral leases and other coal leases held by the same lessee are unaffected.

of oil and gas leases to oil companies that owned coal companies or leases for minerals other than coal. Plaintiffs contend such "far-reaching" effects would not pass unnoticed.

No significance may be attached to Congress' silence in the legislative history. To infer intent from congressional silence, and to elevate that silence over a positive congressional enactment, entirely distorts legislative intent. As the Supreme Court has observed, "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942).

Plaintiffs also direct the Court to five specific instances in the legislative history where Section 3 of the FCLAA is discussed.[13] According to plaintiffs, the context in which the unmodified word "lease"

is used in these passages compels the conclusion that only "coal lease" was meant.

The two passages in the House Report which plaintiffs cite are ambiguous.[14] At best these references support an interpretation of either "coal lease" or "mineral lease." An ambiguous reference in the legislative history cannot overcome clear statutory language. Equally unpersuasive are plaintiffs' three citations to floor debate where the members of Congress quoted were simply explaining the FCLAA.[15] Since the FCLAA was fully explained in the House Report, the Court refuses to attach any weight to these extemporaneous statements in which the speakers attempted merely to paraphrase the written reports. This is not a situation where there was a floor amendment and the floor debate is important because it is the only source of legislative history. *See, e.g.,*

---

**13.** Plaintiffs cite H.R.Rep. No. 681, 94th Cong., 1st Sess. 15, 22 (1975); 122 Cong.Rec. 4135 (daily ed., Jan. 21, 1976) (remarks of Rep. Mink); *id.* at 4143 (remarks of Rep. Drinan); *id.* at S9883 (daily ed., June 21, 1976) (remarks of Sen. Metcalf).

**14.** The first passage quoted by plaintiffs reads:
The problems of speculation are addressed by H.R. 6721, which requires termination of any lease not producing in commercial quantities at the end of 15 years. Old leases ... would be exempt from this provision [FCLAA § 6], except to the extent it might be made applicable upon readjustment of lease terms, but the lessees would be prohibited from acquiring any new Federal leases should they continue to hold old leases 15 years after enactment without producing therefrom.
H.R.Rep. No. 681, 94th Cong., 2d Sess. 15 (1975), U.S.Code Cong. & Admin. News 1976, p. 1951.
The second passage reads:
[Section 3] would bar the issuance of new leases to any individual or corporations that have held a lease for a period of 15 years, beginning on the date of enactment of the Federal Coal Leasing Amendments Act of 1975, without producing coal therefrom.
*Id.* at 22, U.S.Code Cong. & Admin.News 1976, p. 1958. Subsequent to its passage by the House, the FCLAA was amended to change "15 years" to "10 years."

**15.** Plaintiffs also cite in support of their of the word "lease" reading an unenacted floor amendment proposed by Representative Hughes which contained the words "lease or leases under the

terms of this Act." *See* 122 Cong.Rec. 4161 (daily ed. Jan. 21, 1976). Plaintiffs contend that Representative Hughes confirmed that these words in his amendment dealt only with coal leases, and also that Congress' consideration of this amendment, which was ultimately defeated, shows Congress' understanding that these words means "coal leases."

Hughes' amendment was intended to forbid entirely oil and gas companies from obtaining coal leases, in an attempt to prohibit increasing concentration in the field of energy. *See id.* The brief debate on the amendment was confined to its substantive provisions. There was no discussion of the precise meaning of the words "lease or leases under the terms of this Act." *See id.* at 161–63.

The Court finds irrelevant to this case the entire congressional debate surrounding Representative Hughes' amendment. There is in the debate no indication of what Congress, as opposed to Representative Hughes, understood his language to mean. Since the amendment was defeated, Congress had neither occasion nor need to harmonize the language of this amendment with the language of the statute as passed. The Court is unimpressed that Representative Hughes himself understood the words "lease or leases under the terms of this Act" to refer to "coal lease or leases." An individual legislator may well be personally confused as to the meaning of a statutory phrase; the Court will not attribute to the Congress as a whole an individual legislator's interpretation, particularly where it is a phrase from an unenacted floor amendment whose exegesis plaintiff offers as authoritative for the statute as a whole.

**294**

*Northeast Bancorp v. Board of Governors,* —— U.S., ——, ——, 105 S.Ct. 2545, 2551, 86 L.Ed.2d 112 (1985).

Contrary to plaintiffs' assertions, the legislative history demonstrates that Congress was aware at the time of enactment of the way the Department of the Interior construed the language of the proposed statute. In a July, 1975 letter to Congress commenting on H.R. 6721, the predecessor of the statute finally enacted, the Department of the Interior called to the attention of Congress the penalty provision of Section 3 of the FCLAA. In the letter, which was reprinted in the House Report on the FCLAA, the Department wrote: "The penalty for not producing within 10 years would not only be cancellation of the lease, but cancellation of any other lease issued under the Mineral Leasing Act that the person, association, or corporation holds." H.R.Rep. No. 681, 94th Cong., 1st Sess. 38 (1975), U.S.Code Cong. & Admin.News 1976, pp. 1974, 1975. The inclusion within the committee report of such a plain statement of the enforcing agency's interpretation of proposed legislation conclusively demonstrates that Congress was aware of this interpretation.

Plaintiffs' legislative-history argument in support of their position is rejected.

### 3. *Administrative Interpretation*

Plaintiffs also contend that the Department of the Interior has changed its interpretation of Section 3 of the FCLAA. A review of the pertinent materials convinces the Court that plaintiffs are wrong.

As noted above, *see supra,* p. 294, the Department's July, 1975 letter to Congress regarding the proposed act contained an interpretation identical to that now contested by plaintiffs. The Department in 1980

issued a Solicitor's Office opinion that concluded: "Both a fair reading of Section 3 itself and the legislative history support the conclusion that the penalty for violating Section 3 is to bar a lessee from obtaining any of the various types of mineral leases obtainable under the Mineral Leasing Act." This 1980 opinion, although not formally published or adopted by the Department, was distributed to the public upon request, and was provided to the American Mining Congress, a major industry group to which plaintiffs belong. Dkt. 11, at 16–17. In the course of numerous legislative hearings on bills to repeal Section 3 in 1982, 1983, and 1984, Department officials repeatedly expressed the Department's view that the Section 3 penalty applied to all mineral leases, not just coal leases. *See* Federal Coal Leasing Amendments Act of 1982: *Hearings on S. 2704 Before the Subcomm. on Energy and Mineral Resources of the Senate Comm. on Energy and Natural Resources,* 97th Cong.2d Sess. 9 (1982) (statement of Garrey E. Carruthers, Ass't Sec'y, Dep't of the Interior); Amending the Mineral Leasing Act of 1920: *Hearings on S. 1634 Before the Subcomm. on Energy and Mineral Resources of the Senate Comm. on Energy and Natural Resources,* 98th Cong., 1st Sess. 9 (1983) (statement of J. Stephen Griles, Dep. Ass't Sec'y, Dep't of the Interior); To Amend the Mineral Lands Leasing Act of 1920: *Hearings on H.R. 1530 Before the Subcomm. on Mining Forest Management and Bonneville Power Administration of the House Comm. on Interior and Insular Affairs,* 90th Cong., 2d Sess. 5 (1984) (statement of J. Stephen Griles, Dep. Ass't Sec'y, Dep't of the Interior).[16]

In a memorandum to the Assistant Secretary for Land and Minerals Management

---

**16.** Not only interior officials charged with enactment of this section, but the chairman of plaintiff Consolidated Coal in testimony to Congress understood this to be the recognized interpretation of Section 3. *See* Amending the Mineral Leasing Act of 1920: *Hearing on S. 1634 Before the Subcomm. on Energy and Mineral Resources of the Sen. Comm. on Energy and Natural Resources,* 98th Cong., 1st Sess. 176

(1983) (statement of B.R. "Bobby" Brown, Chairman and Chief Executive Officer, Consolidation Coal Co.) ("under Section 3 of FCLAA these [coal] lessees must relinquish all undeveloped [pre-1976 coal] leases ... *or they are barred from obtaining any new leases of oil, gas, coal, or any other leasable material*") (emphasis added).

dated February 12, 1985, the Solicitor concluded that Section 3 of the FCLAA applies to all MLLA leases. Memorandum M–36951 from Department of the Interior Solicitor to Assistant Secretary for Land and Minerals Management (Feb. 12, 1985). The Secretary subsequently published Draft Guidelines on Section 2(A)(2)(A) of the MLLA. 50 Fed.Reg. 6398 (Feb. 15, 1985). Appendix B of the Draft Guidelines listed the types of minerals that may not be leased to any entity or affiliate which cannot satisfy the requirements of Section 2(a)(2)(A) on or after August 4, 1986.[17] *Id.* at 6400. The minerals listed were coal, gilsonite (including all vein-type), solid hydrocarbons, oil and gas (including tar sands), oil shale, phosphate, potash, sodium, and sulphur. *Id.* at 6406.

Subsequent to the filing of this suit, the Secretary on August 29, 1985 issued Final Guidelines for the Department's administration of Section 2(a)(2)(A). See 50 Fed. Reg. 35125 (Aug. 29, 1985). The guidelines interpret Section 2(a)(2)(A) as prohibiting a federal coal lessee, or any affiliate, from acquiring any new federal leases under the MLLA for coal or other minerals if the coal leasee has held a nonproducing federal coal lease for more than ten years from August 4, 1986. *Id.* at 35126, 35133.[18] This interpretation is consistent with the Secretary's pre-litigation posture with respect to Section 2(a)(2)(A).

Thus, the Department has consistently construed the penalty provision of Section 3 to apply to all mineral leases.

Plaintiffs argue that the Department's coal-leasing regulations implementing Section 3, contained in 43 C.F.R. §§ 3400 *et seq.*, limit the scope of the Section 3 penalty to coal leases only. Section 3472.1–2(e) states:

> After August 4, 1986, no lease shall be issued to any applicant or bidder ... that holds and has held for 10 years any lease

from which coal is not being produced ... in commercial quantities....

43 C.F.R. § 3472.1–2(e) (1984).[19] As used in this part,

> "Lease" means a Federal lease, issued under the coal leasing provisions of the mineral leasing laws, which grant the exclusive right to explore for and extract coal. In provisions of this group that also refer to Federal leases for minerals other than coal, the term "Federal coal lease" may apply.

43 C.F.R. § 3400.0–5(r) (1984).

Regulations governing oil and gas-lease qualifications are found in 43 C.F.R. § 3102 (1984). These regulations do not discuss Section 3. Plaintiffs argue that, because no other regulations have been promulgated for Section 3, the regulations at 43 C.F.R. § 3400 *et seq.* necessarily indicate that the Secretary interprets the penalty provision of Section 3 to apply to coal leases only.

■ When faced with a problem of construing an administrative regulation, a court must show the interpretation given by the officers or the agency charged with its enforcement deference even greater than the judicial deference given to agency interpretation of a statute. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "[T]he agency's interpretation of a regulation 'is deemed of controlling weight as long as it is one of several reasonable interpretations ... even though the chosen exegesis may not appear quite as reasonable as some other construction.'" *Budd Co. v. Occupational Safety & Health Review Comm'n*, 513 F.2d 201, 205 (3d Cir.1975) (per curiam) (quoting *Roy Bryant Cattle Co. v. United States*, 463 F.2d 418, 420 (5th Cir.1972)).

Plaintiffs' argument ignores that the preamble to the 1982 coal-leasing regulations stated that the "rulemaking relates only to coal leases and implies nothing

---

**17.** *See supra* note 2 for effective date of the statute.

**18.** *See supra* note 2 for the effective date of the statute.

**19.** *See supra* note 2 for the effective date of the statute.

about Section 3's applicability to other minerals." 47 Fed.Reg. 33131 (July 30, 1982). Furthermore, although not issued as regulations, the Final Guidelines published by the Secretary on August 29, 1985 set forth the Department's interpretation of Section 2(a)(2)(A) with respect to *all* federal mineral leases. 50 Fed.Reg. 35125.

The Department's interpretation of 43 C.F.R. § 3472.1–2(e) is reasonable. There appears no reason why the Department should place within the same section of the Code of Federal Regulations all regulations implementing a particular statutory provision, or why the Department should not publish its interpretation of a statutory section partly as regulations and partly as guidelines. The Department has chosen to organize its regulations in a manner the plaintiffs essentially profess to find unintelligible. The Court does not agree.

The regulations and Final Guidelines implementing Section 2(a)(2)(A) were adopted based on the Department's own review of the statute and are fully consistent with the Department's earlier views. *See supra* at pp. 294–95. Consequently, the Court finds the Department's interpretation persuasive. *Cf. Bethlehem Steel Corp. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 157, 160 (3d Cir.1977) (finding nonauthoritative an administrative interpretation of an OSHA regulation which was based on the report of a nongovernmental agency and which was not consistently interpreted by the agency).

■ The plain language of the statute dictates that the word "lease," as used in the opening clause of the first sentence of Section 2 of the MLLA, means "mineral lease" and not "coal lease." Plaintiffs' arguments to the contrary based on the legislative history and on the administrative interpretation fail.

### Conclusion

I have held that Section 2(a)(2)(A) of the MLLA applies to all federal mineral leases and not to federal coal leases only. Accordingly, plaintiffs' motion for summary judgment will be denied and the Secretary's cross-motion will be granted.