# Applicability of Ten-Year Minimum Sentence to Semiautomatic Assault Weapons

Semiautomatic assault weapons are no longer among the firearms to which the ten-year minimum sentence in 18 U.S.C. § 924(c)(1)(B)(i) applies.

November 24, 2009

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

You have asked whether possession of a semiautomatic assault weapon in furtherance of a crime of violence or drug trafficking crime is conduct that remains subject to a mandatory ten-year minimum sentence. Having carefully considered the views of the Criminal Division and the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), we conclude that semiautomatic assault weapons are no longer among the firearms to which the ten-year minimum sentence in section 924(c)(1)(B)(i) of title 18 applies. The 1994 amendment that increased the penalties for use of such firearms in section 924(c)(1) is subject to a sunset provision, and thus was repealed as of 2004. Accordingly, the possession of a semiautomatic assault weapon in furtherance of, or the use during and in relation to, a crime of violence or drug trafficking crime is subject to the general five-year mandatory minimum sentence provided for in section 924(c)(1)(A), with increased penalties for the brandishment or discharge of such weapon.[1]

## I.

Section 924(c)(1) of title 18 makes it a federal offense to use or carry a firearm during and in relation to certain other offenses or to possess a firearm in furtherance of those other offenses. The question you have asked us to consider depends upon the relationship between two amendments that Congress made to section 924(c)(1), the first in 1994 and the second in 1998.

---

[1] As explained herein, section 924(c)(1)(B)(i) of the current United States Code continues to refer to semiautomatic assault weapons. We conclude, however, because of the repeal, that reference should no longer appear in the Code.

Prior to 1994, section 924(c)(1) provided as follows:

> Whoever, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime . . . , be sentenced to imprisonment for five years, *and if the firearm is a short-barreled rifle [or a] short-barreled shotgun to imprisonment for ten years*, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years.

18 U.S.C. § 924(c)(1) (Supp. II 1990) (emphasis added).

In 1994, Congress enacted the Public Safety and Recreational Firearms Use Protection Act ("PSRFUPA" or "Act") as subtitle A of title XI of an omnibus crime bill. *See* Pub. L. No. 103-322, §§ 110101–110106, 108 Stat. 1796, 1996 (1994). The centerpiece of the Act was the so-called "Assault Weapons Ban," which did not affect the existing section 924(c)(1), but instead established a new offense, making it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon," except in compliance with certain specified exceptions. *Id.* § 110102(a). The PSRFUPA further provided a detailed description of the weapons to which the Act applied, *see id.* § 110102(b) (identifying both nineteen specific models of firearms and listing certain defining characteristics of "semiautomatic assault weapons"), and imposed certain labeling requirements for such weapons, *see id.* § 110102(d) ("[t]he serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this statute shall clearly show the date on which the weapon was manufactured"), to facilitate enforcement of the Act's prohibitions.

For present purposes, however, it is a distinct provision of the PSRFUPA that is our focus. Section 110102(c)(2) of the PSRFUPA amended the existing 18 U.S.C. § 924(c)(1) to add semiautomatic assault weapons to the list of firearms subject to a ten-year penalty for use during and in relation to any crime of violence or drug trafficking crime. It provided that "[s]ection 924(c)(1) . . . is amended in the first sentence by inserting ', or semiautomatic assault weapon,' after 'short-barreled shotgun.'" As amended, section 924(c)(1) read, in pertinent part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and *if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years*, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years.

18 U.S.C. § 924(c)(1) (1994) (emphasis added).

Significantly, however, Congress included in the PSRFUPA a sunset provision that limited the temporal effect of the Act. The sunset provision, section 110105(2), stated that "[t]his subtitle and the amendments made by this subtitle . . . are repealed effective as of the date that is 10 years after [PSRFUPA's effective] date." Thus, because section 110102(c)(2) clearly was an "amendment made by this subtitle"—namely, an amendment to 18 U.S.C. § 924(c)(1)—it would have been "repealed" and ceased to have legal force and effect as of 2004 unless Congress enacted intervening legislation that insulated section 110102(c)(2) from the operation of the sunset provision.

In 1998, Congress did enact intervening legislation that amended section 924(c)(1). Congress enacted the legislation in response to *Bailey v. United States*, 516 U.S. 137 (1995), a Supreme Court decision that interpreted section 924(c)(1) and was issued one year after PSRFUPA's enactment. In *Bailey*, the Supreme Court considered what it meant to "use" a firearm for purposes of section 924(c)(1). It held that the government had to prove that a defendant "actively employed the firearm during and in relation to the predicate crime" in order to "sustain a conviction under the 'use' prong" of the statute. *Id.* at 150.

In response to *Bailey*, multiple bills were introduced in both houses of Congress to make clear that the "use" of a firearm for purposes of section 924(c)(1) would not require the active employment of the firearm in the commission of a predicate crime. Significantly, many of these bills proposed further amendments to section 924(c)(1) that went beyond merely responding to the Court's interpretation of the term "use." This legislative activity ultimately resulted in the passage of a 1998 amendment to section

924(c)(1) titled "An Act to Throttle Criminal Use of Guns." The 1998 amendment provided that "[s]ection 924(c) of title 18, United States Code, is amended . . . by striking '(c)' and all that follows through the end of paragraph (1) and inserting the following:

> "'(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
>> "'(i) be sentenced to a term of imprisonment of not less than 5 years;
>>
>> "'(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>>
>> "'(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
>
> "'(B) If the firearm possessed by a person convicted of a violation of this subsection—
>
>> "'(i) is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or
>>
>> "'(ii) is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.'"

Pub. L. No. 105-386, § 1(a)(1), 112 Stat. 3469, 3469 (1998).

The 1998 amendment therefore split section 924(c)(1) into two new subsections—18 U.S.C. § 924(c)(1)(A) and 924(c)(1)(B)—and made three major changes to the section's operation. First, new section 924(c)(1)(A) made clear that the offense created by section 924(c)(1) applies not only to any individual who "uses or carries a firearm," but also to one who, "in furtherance of any such crime, possesses a firearm." Second, the remaining portion of subsection (c)(1)(A) imposed new minimum terms of imprisonment for specified types of firearms use. In lieu of the pre-1998

fixed five-year sentence, the amendment made the new baseline sentence for any use a minimum of five years, and it created new sentences of a minimum of seven and ten years, respectively, for the "brandishment" and "discharge" of a firearm during and in relation to a predicate crime.

The third change was set forth in the new subsection (c)(1)(B) and addressed the sentences imposed for possession of certain types of firearms. The list enumerating these firearms did not change from the pre-1998 version of section 924(c)(1), as already amended by the PSRFUPA. As was the case before 1998, that list included short-barreled rifles, short-barreled shotguns, semiautomatic assault weapons, machineguns, destructive devices, and firearms equipped with a silencer or muffler. And, as was the case before 1998, semiautomatic assault weapons were treated identically to short-barreled rifles and short-barreled shotguns, just as the 1994 PSRFUPA had prescribed. The only change was that, whereas offenses involving semiautomatic weapons, short-barreled rifles, and short-barreled shotguns were subject to a fixed ten-year term before 1998, and offenses involving machine guns, destructive devices, and firearms with silencers or mufflers were subject to a fixed thirty-year term before 1998, the 1998 amendment made such offenses subject to mandatory *minimum* terms of ten and thirty years, respectively. In making this change, however, the 1998 amendment retained the term "semiautomatic assault weapon" in precisely the same relation to the other terms in this section as had been prescribed in 1994 by the PSRFUPA amendment to section 924(c)(1).

## II.

Whether the sunset provision of the 1994 PSRFUPA repealed the PSRFUPA amendment that added "or semiautomatic assault weapon" to section 924(c)(1) turns on the following question: Did the subsequent 1998 amendment to that section preserve the 1994 PSRFUPA amendment adding semiautomatic assault weapons, or did it instead abrogate that earlier PSRFUPA amendment and enact a new provision to replace it? If the 1998 amendment did not abrogate the 1994 amendment, then in 2004 the sunset provision of PSRFUPA repealed the 1994 amendment that added "or semiautomatic assault weapon" to section 924(c)(1). If, on the other hand, the 1998 amendment did abrogate and replace the relevant

part of the then-existing version of section 924(c)(1), then the sunset provision of PSRFUPA would not apply to the language enumerating "semiautomatic assault weapon"; the language in question would no longer appear in the section by virtue of an "amendment" "made by" the 1994 PSRFUPA and thus would be insulated from the operation of the PSRFUPA sunset provision.

In resolving the question, we are mindful that the effect of the 1998 amendment on the operation of the 1994 sunset provision has been the source of some uncertainty.[2] Even the Code publishers have taken varying views. The official U.S. Code retained the term "semiautomatic assault weapon" in section 924(c)(1)(B)(i) after 2004. 18 U.S.C. § 924(c)(1)(B)(i) (2006). West Publishing, however, removed the term from the U.S. Code Annotated from 2004 through 2008, before reinstating the term in its 2009 edition. *Compare* 18 U.S.C.A. § 924(c)(1)(B)(i) (2008), *with* 18 U.S.C.A. § 924(c)(1)(B)(i) (2009).

We are also aware that the issue has generated disagreement within the Department of Justice. In 2004, before the sunset provision repealed PSRFUPA, the Criminal Division took the position that the provision in section 924(c)(1)(B) concerning semiautomatic assault weapons would expire that year. It stated in the USABook, a Justice Department resource manual, that "there is nothing in the legislative history [of the 1998 law] to indicate that in rewriting § 924(c)(1), Congress intended to effectively repeal the sunset provision for semiautomatic assault weapons in § 924(c)." *Q & As on the Effect of the Expiration of the Assault Weapons Ban (AWB)*, USABook Online, http://10.173.2.12/usao/eousa/ole/usabook/fire/appxd.htm (last visited Nov. 7, 2009). However, the Criminal Division now takes a different view, maintaining that the sunset provision did not affect section 924(c)(1)(B)(i) because Congress struck

---

[2] No court has squarely addressed this question of statutory construction. Although two courts of appeals have suggested that semiautomatic assault weapons should no longer be subject to the mandatory ten-year sentence, it does not appear that the issue was squarely presented in those cases because the defendants committed their offenses before 2004, making the ten-year mandatory minimum sentence applicable regardless of whether the sunset provision caused the semiautomatic assault weapon language in section 924(c)(1)(B)(i) to be "repealed" in 2004. *See United States v. Klump*, 536 F.3d 113, 120–21 (2d Cir.), *cert. denied*, 129 S. Ct. 664 (2008); *United States v. Cassell*, 530 F.3d 1009, 1012 n.1 (D.C. Cir. 2008), *cert. denied* 129 S. Ct. 1038 (2009).

section 924(c)(1) in 1998 and replaced it with a new sentencing scheme that differed, in several respects, from the 1994 version of the law— thereby leaving in place no 1994 amendment to section 924(c)(1) that could be repealed. *See* Memorandum for David Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Lanny A. Breuer, Assistant Attorney General, Criminal Division, *Re: 18 U.S.C. § 924(c)(1)(B)(i) and Semiautomatic Assault Weapons* at 1 (July 30, 2009) (stating that "the sunset provision does not apply to the 1998 revision of Section 924(c)(1)" and referring to an attached July 14, 2009 memorandum from Patty Stemler, Chief of the Criminal Appellate Section, in support). By contrast, ATF is of the view that the sunset provision did repeal the semiautomatic assault weapon language in section 924(c)(1)(B)(i) as of 2004. It argues that to accept the Criminal Division's position would be to conclude that Congress implicitly repealed the sunset provision (at least as it would have applied to section 924(c)(1)) in 1998, but that there is no basis for concluding that such an implicit repeal occurred. *See* Memorandum for Office of Legal Counsel, from Stephen R. Rubenstein, Chief Counsel, ATF, *Re: Section 924(c) and the* "*Semiautomatic Assault Weapon*" *Sentence Enhancement* (Sept. 11, 2009).

## A.

As both the Criminal Division and ATF acknowledge, neither the plain text of the PSRFUPA, nor the plain text of the 1998 amendment to section 924(c)(1), resolves the issue. The PSRFUPA obviously does not speak to whether Congress, in *subsequently* passing the 1998 amendment, intended to affect the application of the PSRFUPA sunset provision to the 1994 PSRFUPA amendment that added "semiautomatic assault weapon" to section 924(c)(1). And for its part, the 1998 amendment makes no reference, one way or the other, to the PSRFUPA sunset provision.

Because of this textual silence, we must look elsewhere for interpretive guidance. In particular, we rely on an established canon of statutory construction, endorsed in treatises and both federal and state case law, for resolving ambiguities of the sort we confront here. That canon provides that "[p]rovisions of [an] original act or section which are repeated in the body of the amendment, either in the same or equivalent words, are considered a continuation of the original law." 1A Norman Singer, *Suther-*

*land on Statutory Construction* § 22.33, at 392 (6th ed. 2000); *see also Posadas v. Nat'l City Bank*, 296 U.S. 497, 505 (1936) ("a later act repeating provisions of an earlier one is a continuation, rather than an abrogation and reenactment, of the earlier act"; "provisions of a prior statute, so far as they are reproduced in a later one, are to be construed as a continuation of such provisions and not as a new enactment"); *id.* (noting common-law origins of this interpretive principle).[3]

---

[3] *See also, e.g.*, *Kirchner v. Kan. Turnpike Auth.*, 336 F.2d 222, 230 (10th Cir. 1964) ("Provisions of the original Act which are repeated in the body of the amendment, either in the same or equivalent words, are considered a continuation of the original law"); *Tyson v. United States*, 285 F.2d 19, 22 (10th Cir. 1960) ("A general rule of construction is that provisions of an original act or section re-enacted or substantially repeated in an amendment are construed as a continuation of the original law."); *Sutton v. State*, 101 N.E.2d 636, 638 (Ind. 1951) ("The unchanged portions of the statute are not to be considered as repealed and reenacted. They are continued in force, with the same meaning and effect after the amendment that they had before."); *In re Prime's Estate*, 32 N.E. 1091, 1093 (N.Y. 1893) ("Where the amended act re-enacts provisions in the former law, either *ipsissimis verbis* or by the use of equivalent, though different words, the law will be regarded as having been continuous[.]"); *cf. Am. Casualty Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 n.7 (2d Cir. 1994) ("Where sections of a statute have been amended but certain provisions have been left unchanged, we must generally assume that the legislature intended to leave the untouched provisions' original meaning intact."); *Sierra Club v. Sec'y of the Army*, 820 F.2d 513, 522 (1st Cir. 1987) ("Absent some evidence of an attempt to change that construction, a substantial reenactment of the law incorporating its preexisting phraseology is usually the functional equivalent of codifying the earlier construction into the statute.").

As a corollary to this interpretive principle, state courts have held that provisions of an original act that are reenacted in an amendatory act are repealed when the original act is repealed. *See, e.g.*, *Sutton*, 101 N.E. 2d at 638 ("Since the provisions of the original act which were 're-enacted' in the amendatory act are but a continuation of the original act, the repeal of the original act by the Act of 1939 repeals those provisions of the original act which were 're-enacted' in the amendatory act[.]"); *In re Yakima Amusement Co.*, 73 P.2d 519, 521 (Wash. 1937) ("In the event of the subsequent repeal of the prior or original statute, the provisions of the first statute continued in force in the second statute are repealed and fall with the abrogation of the original statute."); *Duke v. Am. Casualty Co.*, 226 P. 501, 504 (Wash. 1924) ("[T]he rule respecting construction of amendments is that, where a section of an original act has been amended, the amendment superseding the original action, a subsequent statute amending the original section by number, but not amending the section as amended, supersedes and repeals the amendatory law" (internal quotation marks omitted)); *see also* 1A Norman Singer, *Sutherland on Statutory Construction* § 22.39, at 430 (6th ed. 2000).

This canon is grounded in a longstanding legislative practice of reenacting in full an entire amended provision, even where only limited, discrete changes are made, as a convenient means of making clear how the new law should read. As the Supreme Court has explained, amending a statute by "repeating the language of the original section with the [new] additions" is generally done to "serve the causes of convenience and certainty. That is to say, by carrying the full text forward, the task of searching out and bringing together the various fragments which go to make up the completed whole, after specific eliminations or additions by amendment, is rendered unnecessary; and possible doubt as to the precise terms of the law as amended is avoided." *Posadas*, 296 U.S. at 505–06.[4]

---

[4] Consistent with this rationale, many state constitutions still require that an amended provision be set out in full so as to "avoid the confusion caused by the distribution of different parts of the same section in different enactments." *Ex parte Allen*, 110 N.E. 535, 536–37 (Ohio 1915) (internal quotation marks omitted). *See also, e.g.*, Ala. Const. art. IV, § 45 ("[N]o law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length."); Ariz. Const. art. IV, pt. 2, § 14 ("No Act or section thereof shall be revised or amended by mere reference to the title of such Act, but the Act or section as amended shall be set forth and published at full length."); Fla. Const. art. III, § 6 ("Laws to revise or amend shall set out in full the revised or amended act, section, subsection or paragraph of a subsection."); Idaho Const. art. III, § 18 ("No act shall be revised or amended by mere reference to its title, but the section as amended shall be set forth and published at full length."); Ky Const. § 51 ("[N]o law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be reenacted and published at length."); Md. Const. art. III, § 29 ("[I]t shall be the duty of the General Assembly, in amending any article, or section of the Code of Laws of this State, to enact the same, as the said article, or section would read when amended."); Mich. Const. art. IV, § 25 ("[I]t shall be the duty of the General Assembly, in amending any article, or section of the Code of Laws of this State, to enact the same, as the said article, or section would read when amended."); Miss. Const. art IV, § 61 ("No law shall be revived or amended by reference to its title only, but the section or sections, as amended or revived, shall be inserted at length."); Mo. Const. art. III, § 28 ("No act shall be amended by providing that words be stricken out or inserted, but the words to be stricken out, or the words to be inserted, or the words to be stricken out and those inserted in lieu thereof, together with the act or section amended, shall be set forth in full as amended."); Neb. Const. art. III, § 14 ("No law shall be amended unless the new act contains the section or sections as amended and the section or sections so amended shall be repealed."); N.M. Const. art. IV, § 18 ("No law shall be revised or amended, or the provisions thereof extended by reference to its title only; but each section thereof as revised, amended or extended shall be set out in full."); Or. Const. art. IV, § 22 ("No act

Given this long-standing practice, the "continuation" canon described above ensures that the legislature's amendment of a statute by "repeating the language of the original section with the [new] additions" will not mistakenly be construed as an implied repeal, or "abrogation and reenactment," *Posadas*, 296 U.S. at 505, of the entire statutory provision. This canon thus works in tandem with, and reinforces, the well-established canon disfavoring implied repeals,[5] and it further functions to avoid anomalies that could arise if re-enacted statutory provisions were construed as repeals of prior identical (or functionally identical) language. For these reasons, we see no basis for concluding that the canon should not apply in the circumstances presented here,[6] given that Congress has

_____

shall ever be revised, or amended by mere reference to its title, but the act revised, or section amended shall be set forth, and published at full length."); Wash. Const. art. II, § 37 ("No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."). These constitutional requirements are not intended to "change the operation of the original section as to provisions which are not changed." *Allen*, 110 N.E. at 537.

[5] *See, e.g.*, *Am. Standard Life Ins. Co. v. State*, 147 So. 168, 168 (Ala. 1933) ("The repeal and simultaneous re-enactment of substantially the same statutory provisions is to be construed not as an implied repeal of the original statute, but as [an affirmance and] a continuation thereof." (internal quotation marks omitted)); *Robinson v. Ferguson*, 93 N.W. 350, 352 (Iowa 1903) ("The repeal and simultaneous reenactment of substantially the same provisions is not to be considered as an implied repeal of the original statute, but as a continuation thereof, so that all interests under the original statute shall remain unimpaired. The same rule applies to general revisions of existing laws which are substantially reenacted." (internal quotation marks omitted)); *see also, e.g.*, *Carcieri v. Salazar*, 129 S. Ct. 1058, 1068 (2009) ("'We have repeatedly stated . . . that absent "a clearly expressed congressional intention," . . . [a]n implied repeal will only be found where provisions in two statutes are in "irreconcilable conflict," or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute."'") (quoting *Branch v. Smith*, 538 U.S. 254, 273 (2003) (plurality opinion) (internal citations omitted))).

[6] There is precedent, albeit limited, to support the canon's application in circumstances directly analogous to the unusual one presented here, where the amendment to the preexisting statute carried forward the prohibition of certain conduct, but both expanded its application and changed the terms of punishment. In *Ex parte Allen*, 110 N.E. 535 (Ohio 1915), for example, a habeas petitioner challenged his sentence for the sale of cocaine under an amended Ohio provision that prescribed imprisonment instead of a fine for the subsequent violation of the same statutory prohibition. The petitioner had previously been convicted under a law that punished the sale of cocaine with a monetary fine. Petitioner was then convicted again under the amended version of the law that, in addition to

carried forward identical language from a prior enactment without expressly stating its intention regarding the continuing effect of an earlier-enacted repealer. Indeed, there is a sound basis for applying the "continuation" canon, in the absence of contrary congressional intent, to amendments carrying forward language from laws subject to a sunset provision. When, at the time of amendment, the original enactment is subject to a sunset provision, the legislature is well-positioned to make clear its intention to insulate the amendment from the automatic repeal that would otherwise occur. Its failure to do so fairly gives rise to the presumption against abrogation and reenactment that the "continuation" canon reflects.

In accord with the canon, and absent evidence of contrary congressional intent, the 1998 inclusion of the phrase "or semiautomatic assault weapon" in section 924(c)(1)(B)(i) should be construed as a continuation "to serve the causes of convenience and certainty," *Posadas*, 296 U.S. at 505–06, of the original 1994 amendment that added the phrase to section 924(c)(1), rather than as an "abrogation and reenactment" of that language. And if the 1998 amendment is so read, then the 1994 amendment

---

cocaine, prohibited the sale of other drugs and punished a second violation of the statute with incarceration. Petitioner challenged his sentence on the grounds that he should have been punished with only a fine as a first-time offender under the amended statute, "notwithstanding his prior conviction under the statute before its amendment." 110 N.E. at 537. The court noted that if the amendment had abrogated and repealed the original law "as to those parts which have not been altered in the amending act," then the petitioner's contention was "well founded," "but not so if the amendment [wa]s simply a continuance thereof in so far as the language of both [were] identical or substantially so." The court applied the "continuation canon" and concluded that the provision of the statute making it an offense to sell cocaine continued in force and was undisturbed by the amendment. The addition of other covered drugs and the changed terms of punishment for subsequent violations of the statutory offense were not sufficient to disrupt the original law. *Id.*; *cf. Oldham v. Rooks*, 361 So. 2d 140 (Fla. 1978) (after determining that the Florida legislature had implicitly repealed an 1891 law as of 1970, the Florida Supreme Court held that that 1970 repeal thereby rendered inoperative a 1971 amendment to the original law where the only change in 1971 was to the penalty; that later amendment to the penalty, the court held, was insufficient to revive the underlying offense that the legislature had impliedly repealed the year before); *State v. Cline*, 339 P.2d 657, 661 (Mont. 1959) ("[t]here is substantial authority . . . holding that where the effect of the amendment of a statute is only to increase the prescribed punishment, the unchanged portion of the amended statute remains in effect"). We are not aware of any precedent, moreover, that would indicate the canon should not apply in cases of this kind.

originally adding "or semiautomatic assault weapon" remained in place and subject to the PSRFUPA sunset provision as of 2004.

The canon establishes only a presumption, however, and we must therefore examine whether there is a basis for concluding that Congress intended a different result when it enacted the 1998 amendment to section 924(c)(1). We begin by considering the fact that the 1998 enactment purported to "strike" section 924(c)(1) in its entirety and "insert" in its place a newly crafted revision. *See* Pub. L. No. 105-386, § 1(a)(1), 112 Stat. at 3469 ("Section 924(c) of title 18, United States Code, is amended . . . by striking . . . all that follows through the end of paragraph (1) and inserting the following").

In our view, such a "strike-and-insert" method of amendment does not in this context indicate a congressional intent to repeal, or abrogate-and-reenact, the preexisting provision in question. As discussed above, there is historic legislative practice, when amending statutes, to reenact the entire text of the statute as amended, rather than simply to note, in the amendatory public law, the particular changes that have been made to the text. Consistent with this practice, a 2003 Congressional Research Service report discussing "some common forms in which bills may express their intended relation to existing statutes" notes that when the express purpose of a bill is to modify or alter provisions of existing law, it may do so through various means of legislative drafting. The bill "may identify each separate point in existing statutes at which text is to be stricken out and, for each, set forth text to be inserted. Alternatively, it may propose to strike out an entire provision, then set forth, to be inserted in lieu, a new text, incorporating all the changes in language desired at every point in the provision. Finally, a bill may simply provide that a specified provision 'be amended so as to read' in the way specified by text that follows." Richard S. Beth, *How Bills Amend Statutes* (Aug. 4, 2003), http://fas.org/sgp/crs/misc/RS20617.pdf. The report does not distinguish between these forms of legislative drafting in terms of the substantive effect of an amendment. In line with the practices the report describes, courts have construed language striking and replacing existing provisions—even language that expressly uses the word "repeal"—as not constituting a repeal or abrogation of provisions carried forward into the amended statute. *See, e.g.*, *Kirchner*, 336 F.2d at 230 ("Provisions of the original Act which are repeated in the body of the amendment, either in the same or equivalent

words, are considered a continuation of the original law. This rule of interpretation is applicable even though the original Act or section is expressly declared to be repealed." (citations omitted)).

We think such an interpretation of the significance of the strike-and-insert language is especially appropriate with respect to the 1998 enactment amending section 924(c)(1). The changes—in particular, the new graduated sentencing scheme distinguishing between the use and the brandishing or discharge of a firearm in the commission of a crime—made it significantly more complicated to parse the various penalties prescribed in the statute. Congress may be understood to have decided, as the canon anticipates, to "serve the causes of convenience and certainty" by setting forth the entire amended statute within the public law itself, rather than by specifying the various amendatory provisions that the code publishers would have to fashion into a coherent whole. For these reasons, we do not believe that Congress's choice to "strike" section 924(c)(1), and insert a newly organized replacement, evinces an intent to abrogate-and-reenact the entirety of the earlier version of the statute sufficient to overcome the presumption established by the "continuation" canon.

We turn next to the three substantive changes that the 1998 amendment did make to the statute, which we described above, in order to determine whether they demonstrate that Congress intended to insulate the "semiautomatic assault weapon" language from operation of PSRFUPA's sunset provision. In our view, they do not. In so concluding, we find it significant that, although those changes were clearly important, they did not affect the types of firearms to which a ten-year sentence attached. Nor did they alter the basic judgment, embodied in the text that PSRFUPA originally added to section 924(c)(1), that the use of semiautomatic assault weapons should receive the same sentencing treatment as the use of short-barreled rifles and short-barreled shotguns.

First, the 1998 enactment specified, in the new subsection (c)(1)(A), that—contrary to the Supreme Court's decision in *Bailey*—the federal offense would henceforth cover cases involving not just the more active "use" of firearms, but also possession in furtherance of any crime of violence or drug trafficking crime. But that change did not alter or affect the 1994 amendment's specific reference to semiautomatic assault weapons. To be sure, after 1998, *possession* of such weapons in furtherance of

a predicate crime—in addition to more active uses—became a separate federal offense. But in this respect, the 1998 amendment merely treated semiautomatic assault weapons the same as it treated all other firearms, a general state of equivalence that the statute established even before the 1994 amendment. Nothing in the 1994 PSRFUPA affected this basic statutory equivalence, or altered the fact that semiautomatic assault weapons were already "firearms" covered by the description of the conduct prohibited by section 924(c)(1) prior to PSRFUPA's amendment of the section in 1994. And the same is true for the 1998 amendment. The new subsection (c)(1)(A) sets forth the basic prohibition on the use, carry, or possession of a "firearm," but, as in the predecessor section (c)(1), it does not refer separately to semiautomatic assault weapons.

Second, the 1998 amendment, also in subsection (c)(1)(A), imposed a new graduated sentencing scheme based upon the manner in which the "firearm" is used during and in relation to any crime of violence or drug trafficking crime. Whereas all such uses were subject to a fixed five-year sentence before 1998, the 1998 amendment established a new baseline sentence of a *minimum* of five years. The amendment also provided that the "brandishment" and "discharge" of a firearm in relation to such crimes are to be punished by minimum sentences of seven and ten years, respectively. But this change, too, did not in any way affect the PSRFUPA's 1994 amendment of section 924(c)(1). That earlier amendment did not address the appropriate terms of imprisonment for different uses of a "firearm" in the commission of an underlying offense. And the new use-specific sentencing structure that the 1998 amendment added to subsection (c)(1)(A) applies to all "firearms" and does not treat semiautomatic assault weapons separately, or even mention them.

In sum, these first two changes Congress made to section 924(c)(1) in 1998 did not affect, let alone abrogate, the only substantive change made by the 1994 amendment. The sole effect of that 1994 amendment was—subject to the ten-year sunset provision—to treat semiautomatic assault weapons as equivalent to short-barreled rifles and short-barreled shotguns for purposes of setting the sentence for their use during and in relation to any crime of violence or drug trafficking crime. Nothing in the establishment of the new section 924(c)(1)(A), however, reflects a congressional intention to revisit that earlier change, let alone to repeal the temporal limitation that the sunset provision imposed upon it.

The third substantive change made by the 1998 amendment, unlike the other two, did have an impact on the portion of section 924(c)(1) that the 1994 PSRFUPA had amended—namely, the portion of that section that established a ten-year sentence in cases where the firearm in question is a semiautomatic assault weapon. Prior to the 1998 law, if the firearm at issue was "a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon," the punishment was a fixed ten-year sentence. After enactment of the 1998 law, however, if the firearm was "a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon," the new section 924(c)(1)(B)(i) provided that the punishment was to be *not less than* a ten-year sentence. It might be argued, therefore, that this change constituted a tailored and considered means by which Congress abrogated and replaced the earlier 1994 PSRFUPA amendment, which had established a ten-year fixed sentence for certain offenses involving semiautomatic assault weapons. On this view, Congress chose to replace a prior provision that had established a certain sentence, subject to a sunset, with a new provision establishing a more stringent sentence. In doing so, the argument would go, Congress chose not to expressly set forth a sunset for the provision, thereby supporting the inference that Congress intended to abrogate-and-reenact, rather than continue, the language that it had repeated from the prior version of section 924(c)(1), as it had been amended by the 1994 PSRFUPA.

We do not think, however, that the 1998 change from a ten-year fixed sentence to a ten-year minimum, without more, affects our conclusion that the 1998 amendment did not abrogate the 1994 amendment to section 924(c) or repeal the sunset provision as applied to that 1994 amendment. The 1998 amendment changed the sentences in section 924(c)(1) for the use of covered firearms generally—not only for the use of semiautomatic assault weapons—from fixed sentences to mandatory minimums. In other words, the terms of imprisonment with respect to all of the provisions in section 924(c)(1) remained the same, but Congress inserted the phrase "not less than" before the number of specified years in each instance. The categorical approach Congress took, substituting mandatory minimums for fixed sentences, without otherwise altering the terms of imprisonment, does not suffice to show that Congress intended that the possession of a semiautomatic weapon in furtherance of a predicate crime should carry a mandatory minimum ten-year sentence even *after* the sunset provision

repealed all of the other PSRFUPA amendments relating specifically to such weapons. That approach may easily be understood to have preserved the 1994 judgment that those weapons should be treated equivalent to the others in the grouping, unless and until the sunset provision took effect.

Indeed, this latter interpretation draws support from the fact that a construction of section 924(c)(1)(B)(i) that would insulate its "semiautomatic assault weapon" language from the 2004 repeal of the rest of the 1994 PSRFUPA provisions would introduce an anomaly into the law. As noted above, in addition to inserting "semiautomatic assault weapon" in section 924(c)(1), PSRFUPA provided a definition of "semiautomatic assault weapon," which was added to 18 U.S.C. § 921. The 1994-enacted definition of "semiautomatic assault weapon" carefully defined the term to include both nine specifically identified firearms (by make and model), as well as "any . . . copies or duplicates of the [nine specified] firearms in any caliber"; "a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of" five defined characteristics (e.g., a folding or telescoping stock, a bayonet mount, a grenade launcher); a "semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of" five defined characteristics; and "a semiautomatic shotgun that has at least 2 of" four defined characteristics. Pub. L. No. 103-322, § 110102(b), 108 Stat. at 1997; *see also* H.R. Rep. No. 103-489, at 22–23 (1994). There is no doubt, however, that when the PSRFUPA sunset provision took effect in 2004, that definition was repealed.[7] Thus, if the 1998 Congress had intended to preserve a ten-year minimum sentence for "semiautomatic assault weapons" in section 924(c)(1)(B)(i) even beyond the preexisting sunset date, it would have done so with respect to an ambiguously labeled set of firearms, the statutory definition of which would sunset as of 2004.[8] We are reluctant to attribute such an intention

---

[7] ATF regulations, promulgated in 1995, tracked the PSRFUPA's definition of semiautomatic assault weapons and its prohibition on their manufacture, transfer, or possession. *See* 27 C.F.R. §§ 478.11, 478.40 (2009). ATF acknowledges that with the sunset of the PSRFUPA in 2004, these regulations are no longer in effect and should no longer appear in the Code of Federal Regulations.

[8] It is significant in this regard that some definitions of similar terms in state and local law differ from the definition of "semiautomatic assault weapon" that was set forth in PSFUPA. *See, e.g.*, *Arnold v. Cleveland*, No. 59260, 1991 Ohio App. LEXIS 5246, at *4 (Ohio Ct. App. Oct. 31, 1991) (quoting Cleveland Codified Ordinances section 628.02,

to Congress, particularly given that each of the other enumerated weapons subject to increased penalties in section 924(c)(1)(B)—including "short-barreled shotgun," "short-barreled rifle," "machine gun," "destructive device," "firearm silencer," and "firearm muffler"—is expressly defined in section 921(a), the very section of the Code that once contained, but in consequence of the sunset provision of PSRFUPA no longer contains, a definition of "semiautomatic assault weapon." *See* 18 U.S.C. § 921(a)(4), (6), (8), (23), (24).

Another aspect of the relevant statutory context reinforces this same conclusion. When Congress passed the PSRFUPA in 1994, it included an amendment to 18 U.S.C. § 922 that made it unlawful to "manufacture, transfer, or possess a semiautomatic assault weapon." Pub. L. No. 103-322, § 110102(a). In doing so, it subjected semiautomatic assault weapons, for the ten-year period of the legislation, to stringent regulation, akin to that to which the other weapons triggering heightened sentences in section 924(c)(1) were already subject.[9] If the 1998 Congress were understood to have preserved the enhanced sentence for semiautomatic assault weapons in section 924(c)(1)(B)(i) even *after* the repeal of the rest of the PSRFUPA, however, semiautomatic assault weapons would, in that

---

defining "assault weapon" primarily based on the firearm's acceptance of a detachable magazine capable of taking a certain number of rounds); Cal. Penal Code § 12276 (West 2009) (designating roughly 30 semiautomatic firearms as "assault weapons").

[9] For example, 18 U.S.C. § 922(a)(4) makes it unlawful "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machine gun . . . short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity," and 18 U.S.C. § 922(b)(4) makes it unlawful "for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . to any person any destructive device, machine gun . . . short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity." *See* 18 U.S.C. § 922(a)(4), (b)(4) (2006). Further, 18 U.S.C. § 922(o) makes it unlawful for any person to transfer or possess a machinegun. *See id.* § 922(o). The Tax Code also severely regulates, through registration and limits on importation, possession, and transfer, the same types of firearms that are subject to special restriction under the criminal code. *See* 26 U.S.C. §§ 5841, 5844 (2006); *see also id.* § 5861 (defining "firearm" subject to Tax Code regulations to include, among other things, "a shotgun having a barrel or barrels of less than 18 inches in length"; "a rifle having a barrel or barrels of less than 16 inches in length"; "a machinegun"; "any silencer"; and "a destructive device").

case, be the only type of weapon subject to a heightened sentence in section 924(c)(1)(B) that was not otherwise more heavily regulated than firearms generally.

## B.

The legislative history of the 1998 enactment is consistent with the conclusion that the 1998 amendment did not insulate the insertion of "or semiautomatic assault weapon" in section 924(c)(1) from the operation of the PSRFUPA sunset provision in 2004. The history shows that the Supreme Court's *Bailey* decision was the clear impetus for the first two of the three major changes to section 924(c)(1). And while the legislative record shows that the third change to section 924(c)(1)—the shift from fixed to mandatory minimum sentences—was the subject of considerable debate in the House, it does not indicate that the debate was of relevance to the question before us. Instead, the focus of that debate was on whether mandatory minimum sentences served their intended purpose as an effective deterrent against crime.[10] Indeed, we have not uncovered any evidence that members of Congress considered the appropriate mandatory minimum sentence for offenses involving semiautomatic assault weapons in particular, let alone whether such sentences should be established permanently for those firearms.[11]

---

[10] *See, e.g.*, 144 Cong. Rec. 1715, 1717 (statement of Rep. Waters) ("I abhor crime, but this is not about sensible ways to deal with crime. This is about mandatory minimum sentencing, taking away the discretion of judges to make decisions about the varied situations that they may be confronted with. . . . I think this increase in mandatory minimums for crimes that could end up not being violent crimes at all with the simple possession is harmful to our system and should not be done."); *id.* (statement of Rep. Solomon) ("[T]he sooner we enact this legislation, the sooner we can toughen mandatory minimum penalties on those who commit crimes involving guns. In the long run this is a bill to save lives by getting criminals with guns off the street."); *id.* at 1719 (statement of Rep. Scott) ("The bottom line . . . is that mandatory minimums have been studied and are the least, one of the least effective ways to reduce crime. If we are serious about reducing crime, if we are serious about it, we should not pass the mandatory minimums.").

[11] A Department of Justice representative testified on two occasions with respect to the pending legislation. *See Violent and Drug Trafficking Crimes: The Bailey Decision's Effect on Prosecutions Under 924(c): Hearing Before the S. Comm. on the Judiciary*, 104th Cong. (1996) (statement of Kevin Di Gregory, Deputy Assistant Attorney General, Criminal Division) ("Di Gregory 1996 Testimony"); *Criminal Use of Guns: Hearing*

Congress is presumed to have known that the "or semiautomatic assault weapon" language in section 924(c)(1) had been inserted by amendment and was subject to the accompanying sunset provision in the PSRFUPA. *See, e.g.*, *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) (noting canon that "whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject"). We find it significant, therefore, that although there was general debate in 1998 about whether the sentences tied to identified types of firearms should be maintained, there was no discussion of whether the semiautomatic assault weapons amendment should be made permanent in the contemplated revisions to section

---

*Before the S. Comm. on the Judiciary*, 105th Cong. (1997) (statement of Kevin Di Gregory, Deputy Assistant Attorney General, Criminal Division). With respect to mandatory minimum sentences, the testimony simply stated (erroneously, in the sense that section 924(c) did not then provide for mandatory minimum sentences) that "[t]itle 18 U.S.C. 924(c) makes subject to a mandatory minimum punishment beyond that imposed for the predicate crime whoever 'uses or carries a firearm' during and in relation to a crime of violence or a drug trafficking crime." There was no mention of semiautomatic assault weapons other than to point out that "to maintain consistency with the present sentencing scheme," a Senate version of the bill, S. 1612, "would need to include an intermediate category for purpose of sentence incrementation when the firearm employed is a short barreled rifle, short barreled shotgun or a semiautomatic assault weapon." Di Gregory 1996 Testimony at 8 (discussing S. 1612, 104th Cong. (passed Oct. 3, 1996)). The Department of Justice did not address the PSRFUPA sunset provision, let alone the potential effect of the proposed legislation upon its operation.

Likewise, the sunset provision was not addressed in a report that Congress required the Attorney General to provide under section 110104 of the PSRFUPA. That provision directed the Attorney General to "investigate and study the effect of this subtitle and the amendments made by this subtitle, and in particular [to] determine their impact, if any, on violent and drug trafficking crime," and to "prepare and submit to the Congress a report" on the study's findings no later than thirty months after enactment of the law. To satisfy this requirement, the Justice Department awarded a grant to The Urban Institute, which issued the required report in March 1997. *See* Jeffrey A. Roth et al., *The Urban Institute, Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report* (Mar. 13, 1997). The report focused exclusively on the effect of the ban on possession, manufacture, or transfer of semiautomatic assault weapons; it did not address the penalty provisions of the PSRFUPA or what, if any, impact the inclusion of semiautomatic assault weapons among the group of firearms subject to the ten-year sentence in section 924(c)(1) had on any reduction in violent or drug-trafficking crimes. It thus provided nothing to inform Congress whether that provision should be extended past the sunset date, and presumably had no effect on legislative consideration of section 924(c)'s amendment.

924(c)(1).[12] In the absence of any such evidence, there is no basis to conclude that Congress intended to depart from the practice reflected in the "continuation" canon and render that particular provision permanent when it amended other aspects of section 924(c)(1). *See, e.g.*, *Sierra Club*, 820 F.2d at 522 ("congressional silence is strong evidence of a legislative policy that, after reenactment, the [statute] continued to operate exactly as before").[13]

## III.

Accordingly, we conclude that when the sunset provision of PSRFUPA went into effect in 2004, repealing not only the Assault Weapons Ban but also all "amendments made by [PSRFUPA]" to existing law, it repealed the PSRFUPA amendment adding the term "semiautomatic assault weapon" to the enhanced sentencing provision of section 924(c)(1). We therefore conclude that the phrase "or semiautomatic assault weapon" was repealed in 2004; that the ten-year mandatory minimum sentence in

---

[12] So far as we are aware, the only time the PSRFUPA was even acknowledged in the 1998 deliberations was in the following context: The House bill proposed to eliminate the differential punishments applied to specifically identified types of firearms, including semiautomatic assault weapons, in the pre-1998 version of section 924(c)(1). *See* H.R. 424, 105th Cong. (as introduced in the House); H.R. Rep. No. 105-344, at 3 (1997) ("[I]ncreased penalties [set forth in the bill] replace the bifurcated penalties in current law described above for short-barreled rifles, short-barreled shotguns or semiautomatic assault weapons and most other firearms."); *see also id.* at 6 ("[T]he Committee does not intend[] to discriminate between various types of firearms, as current law does, to determine the appropriate number of additional years of imprisonment."). This proposal generated considerable opposition, with some members asserting that the proposal sought to negate the effect of the PSRFUPA generally: "Ever since the ban on semiautomatic assault weapons was passed into law as part of the 1994 Omnibus Crime Bill, the majority has actively sought ways to diminish the significance and the impact of the [assault weapons] ban. The new penalty structure imposed by this legislation [i.e., the proposed, but not-enacted House bill] is simply another way that the majority is attempting to subvert the assault weapons ban without actually voting to repeal the ban." *Id.* at 20 (internal footnote omitted).

[13] If Congress had amended section 924(c)(1) not in 1998, but closer in time to the effective date of PSRFUPA's sunset provision, the conclusions to be drawn from silence in the legislative history with respect to the operation of the sunset provision might be different from the conclusions we draw here from congressional silence in 1998, six years from when the sunset would take effect.

section 924(c)(1)(B)(i) accordingly no longer applies to offenses involving semiautomatic assault weapons; and that such offenses are, instead, subject to the general penalty provisions prescribed by section 924(c)(1)(A).

JEANNIE S. RHEE
*Deputy Assistant Attorney General*
*Office of Legal Counsel*